IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    vs.<br><br>JAMES M. CLARK,<br><br>            Defendant. | **8:12CR342**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on defendant's objections, Filing No. 59, to the findings and recommendation of the magistrate judge, Filing No. 58, on the defendant's motion to dismiss, Filing No. 40.  The defendant is charged with embezzling funds from the Westside Community School District ("the District").  Filing No. 1, Indictment.  The magistrate judge recommended that this court deny the defendant's motion to dismiss, finding, as a matter of law, that the acts of the school district were not attributable to the government.  Filing No. 58, F&R at 2.  The defendant objected to those findings, contending that he was entitled to a hearing on the issue.  This court agreed and an evidentiary hearing was held on February 25 and 26, 2014.

In his motion to dismiss, Clark contends that his due process rights have been violated in that evidence that would prove his innocence has been destroyed.  He argues that the destruction of evidence is attributable to the government.

## I.  FACTS

Three file folders containing records that the defendant maintained in connection with his duties as Westside Community School District's accountant are at issue.  One was a file containing records of gift cards purchased at Nebraska Furniture Mart ("NFM").  Testimony adduced at the hearing showed that the NFM file had been located

in the office of the defendant's former supervisor, Dr. Allan J. Inzerello.  Another was a red expandable folder that contained credit card statements and receipts of purchases of office supplies, etc., which was kept in the vault ("the Discover Card file").  Last, there was a file that contained a running tally of baked goods that the defendant had purchased for office events such as birthday and retirement parties (the "bakery-barter" file).  The defendant kept the bakery-barter file in a cupboard above his desk.

At the hearing, Jean Davis, a retired secretary to the Superintendent of the District, testified that she had worked in the payroll and accounts payable department with defendant Clark until April 2007, when she retired.  She testified that Dr. Inzerello, former Assistant Superintendent of the District, retired shortly before she did.  He was replaced by Dr. Sue Evanich, and Davis then worked for Dr. Evanich.

She testified she worked in the District's Administration Building.  She also stated that there were often parties in the Administration Building for employees' birthdays and retirements.  Cakes were generally purchased for those events and for other functions.  She testified defendant Clark's wife worked at the bakery at Hy-Vee grocery store and would make the cakes.  She testified the business department paid for the cakes.  She stated there was a record of the purchases—Clark would pay for the cakes and kept a running total.  The records were maintained in a file folder in a cabinet above Clark's desk.  She stated the file was a regular-colored manila folder with probably about 10 to 12 sheets of lavender notepaper inside it.  There were handwritten numbers in a column on the pages.

Davis also testified that the district had a policy of giving employees NFM gift cards on some occasions.  She stated Dr. Inzerello gave her a gift card once and he also told her that he had given NFM gift cards to maintenance men.  She also testified

that defendant Clark had been compensated with an NFM gift card when he returned early from a vacation to work on a project.  She testified that records of the NFM gift card purchases were kept in a blue folder in Dr. Inzerello's office.

She also testified that the District had an account with Sam's Club.  At one time, ten employees had Sam's Club cards and could purchase District supplies there.  At some point, Sam's Club recommended switching to a Discover Card that could be used at stores other than Sam's Club.  Defendant Clark then asked the other employees to turn in their Sam's Club cards and a Discover card was issued to Clark.

She testified that the monthly statements for that Discover card were kept in a red expandable folder in the vault.  She described it as an accordion expandable file, four to five inches thick.

Jim Clark was terminated in the spring of 2010.  Davis stated that she has no personal knowledge of what files were in his office after she left in 2008.  She did not know where the files were on March 30, 2010.

Rick Jaworski testified that he was employed by the District as a custodial engineer from 1976 to 2011.  He stated that one of his duties was to purchase or pick up paper towels, Kleenex, hand-sanitizer, pop, water, and other District supplies.  Clark accompanied him at times and they went to Sam's Club for larger quantities.  He would also pick up phones, furniture, carpet, televisions, etc., at NFM.

He stated that he remembers a red folder.  If he bought anything with cash, he would bring in the receipt and Jim Clark would put it in the red folder.  He would then be reimbursed for the things he had purchased.  Jaworski also testified that he received a NFM gift card when he retired.

Another of Jaworski's responsibilities was scheduling the shredding of District documents and records, which was generally done each year in May or June.   Jaworski testified that Bob Zagozda replaced Clark.   At first, Zagozda worked in a cubicle, but later moved into Clark's former office.   Clark's office was later emptied and he was told by Zagozda to call the shred truck.   Thereafter, Jaworski saw 8 to 10 boxes stacked up in the hallway.   He arranged for shredding after checking with a supervisor that he was authorized to do so.   The shredding occurred on September 13, 2010.   *See* Ex. 101, Invoice and Certificate of Destruction from InfoSafe Shredding, Inc.; Reference #10480, dated 9/13/10.   The invoice shows that two 64-gallon containers of documents were shredded.   *Id.*

Jaworski testified that the files that were shredded were folders with tabs in binders.   He took them out of the binders, threw them in a bankers box, and then into the dumpster.   He stated he saw sticky tabs or yellow Post-its with handwritten notations on the documents.

Jaworski also testified that Clark often brought cakes or other baked goods to the office and Jaworski would help carry them in.   He also testified he never saw defendant Clark buy any personal items, all were purchased for the District.

Jaworski also testified that while he worked for the District, he normally ate lunch in the office downstairs, and had opened a drawer with Westside Community Schools Foundation documents in it.   After Clark's termination, he came in one day and all of the documents were gone.

Dr. Alan J. Inzerello, the former Assistant Superintendent of the District, and Clark's direct supervisor until 2007, also testified.   He testified he started working for the school district as a student teacher in 1969 and retired in 2007.   He testified to the

4

District's practice of providing refreshments such as baked goods for meetings—including staff development meetings, parent meetings, morning breakfast meetings—and for retirements, holidays and birthdays.  Routinely, sheet cakes were purchased for these events.  He stated that Jim Clark and his wife regularly furnished the baked goods.  He testified that he assumed Clark was compensated through a reimbursement procedure that had been in place before Dr. Inzerello became Assistant Superintendent.

Dr. Inzerello explained the relationship between the District and the Westside Community Schools Foundation ("the Foundation") and the Early Childhood Development ("ECD") Center.  The District, in association with the community, formed the Foundation long ago to provide philanthropic support to the District in the form of grant applications, staff development, and funding for buildings such as a performing arts facility.  The Foundation also created the ECD Center, which provides pre-kindergarten classes in the District's buildings.  The Foundation exists only to support the District.

He also stated that the District's former policy of giving employees a VCR, DVD player, or TV, at retirement, had evolved over the years to the practice of giving NFM gift cards.  He stated gift cards were regularly purchased at NFM by the District. Further, he testified that the District would contribute to the Foundation's fundraising events, such as the golf tournament, and that these prizes were often purchased at NFM.  Prizes for staff-recognition golf tournaments and end-of-the-year celebrations were also purchased at NFM.  He testified that NFM gift cards had once been given to Clark as compensation for returning to work early from a vacation, and to Clark's son for some work the son had performed.

Dr. Inzerello stated he was not aware of an NFM file.  He was, however, aware of a red file folder that had been kept in the vault, but he could not attest to exactly what was in it.  He stated Mr. Clark maintained a petty cash fund and was authorized to do so.  He also stated that defendant Clark had authority to purchase items for a yearly major fundraising event.

He testified he reviewed the expenditures in a monthly report, but did not analyze each expenditure on the ledger.  He stated he never found anything wrong with defendant Clark's expenditures.

He also testified he remembers that there was a bakery folder, containing tickets like restaurant checks, when he left the District.  He stated that the reimbursement procedure for the baked goods was that if defendant Clark or his wife brought in a cake, they would fill out a yellow reimbursement form, sign it, coded to the appropriate budget line item, and give it to Accounts Payable.

He also testified that he told Clark's attorney that the bakery barter-system had gotten out of control; that Clark had told him he'd let it accumulate, without requesting reimbursement as he went along.  He stated that Clark's expenditures were all appropriate, but that he should have used the proper procedure.

He further testified that he had no firsthand knowledge of files or shredding after he left in 2007.  He testified that he did not take any files with him other than legislative projects he was working on and his personal files when he left the District.

Stephanie Vavruska also testified.  She is the Director of the District's ECD program.  She stated that Clark had been the accountant for the ECD program as well as for the District.  She testified that she had accompanied Clark to NFM to purchase prizes for the Foundation's golf tournament.  They purchased several cameras on one

occasion and iPods on another and paid for the items in cash.  Normally, she presented the receipts and paperwork to Dr. Inzerello, who told her to put the receipt in a red expandable folder in the vault.

She testified that ECD is part of the Foundation and that there was an agreement between the District and the Foundation that Clark would work for both.  Clark processed all the payments for the ECD program.  The Foundation records were in his office.  She stated that there had been files for each vendor with bills and checks in each file.  She testified she had seen the Foundation records after Clark left.  Mr. Zagozda later moved in to Clark's former office.  After Zagozda occupied the office, she needed to check if a vendor had been paid and searched for the file.  Zagozda stated that he did not have the files anymore.

Vavruska also testified that she had seen the bakery folder in a file cupboard above Clark's desk on the right-hand side when Clark worked for the District.  She recalled that $50 and $25 gift cards had been given to employees in 2006 and 2007, but she had never seen an NFM folder in Dr. Inzerello's office.  She also stated that she had never worked at the District Administration Building and she had no firsthand knowledge of shredding practices.  She also testified that she did not know what was in any of the folders on March 30, 2010.

Dr. Sue Evanich also testified.  She was the Assistant Superintendent of Curriculum at the District at the time of Clark's termination.  She was Clark's direct supervisor, who took over for Dr. Inzerello.  She testified that she, District Superintendent Jaquie Estee, and defendant Clark met on March 30, 2010.  At the end of the meeting, Clark was escorted out by Superintendent Estee.  He was told to turn in his keys and was prohibited from entering District property.

She further testified that an investigation of Clark's accounting practices had been triggered by a call from NFM inquiring about the number of gift cards purchased by the District. Superintendent Estee and the District's in-house counsel, Allison McGinn, then met with her and asked about NFM purchases. She stated that after Clark's termination, she was told by either Alison McGinn, or the District's outside counsel, Margaret Hershiser, that Clark was looking for some files. She and McGinn then looked for the bakery-barter file. She also testified that a Discover Card statement was found on Clark's desk on March 30, 2010. *See* Exhibit 104, Sam's Club Discover Card statement.

She stated that she moved into Dr. Inzerello's former office when she took over his position in 2008. She stated that at first she did not remove any files. Later, she went through the files and made a determination to either keep them or throw them away. She threw away many of the files. Further, she testified that she assumed Zagozda similarly threw away many files when he took over Clark's position.

From the time she took over Inzerello's position in 2008 until Clark was terminated in March 2010, he never asked her for an NFM file. She stated that there was no NFM file maintained in the Business Department's office. She also stated that Foundation files had been in Clark's office, but when Zagozda moved in, he moved those files downstairs. She testified she did not shred or destroy any files after Clark's termination, nor was she instructed to do so.

Robert Zagozda also testified. He replaced defendant Clark as accountant for the District. He stated he started as a contractor in April 2010, but became a permanent employee 5 to 6 weeks later. He was contacted by someone from Seim Johnson, an accounting and consulting firm, about the position. He did not know that Seim Johnson

had investigated Clark's performance. Zagozda stated that his job was to process accounting work for the district. He does not know of any bakery item folder.

He testified that the only records he removed from defendant Clark's former office were multi-year sets of binders containing computer-generated reports that had been in upper cabinets. He stated the reports were of no use since the information was duplicative of information maintained in the District's computerized accounting system. He did not notice any handwritten notes on the items he threw away. He further stated he does not recall any vacation file, Hy-Vee file, or gift card file. He did recall that there were historical and monthly activity Foundation files that were moved to archives.

He testified that in late April 2010, Allison McGinn came into his office to look for files. He stated that the shredding event was precipitated by his move to Clark's former office. He stated that it was his decision to shred the documents and no one had advised him to do so.

Margaret Hershiser also testified. She is employed by the Koley Jessen law firm and the District is a client of the firm. She stated she met with Clark and his counsel on April 23, 2010. Clark's attorney sent her an email the following day with a request to look for certain files. She was asked to locate and return those files to Clark; she was not asked to preserve any records.

She did not believe that Clark asked for an NFM file, she believed he asked for a pay-flex file, the bakery file, a vacation-days file, and some personal effects. Her office does not have any of those files and she has not searched for any of those files. She stated that Alison McGinn searched for the files. After getting further emails, McGinn looked again. *See* Ex. 1, Letter to Margaret C. Hershiser from Christine A. Lustgarten, dated April 7, 2010. Hershiser stated that she believes an NFM file was destroyed

when Sue Evanich moved into Inzerello's office.  She also testified that the meeting on April 23, 2010, was the first mention of the bakery-barter folder.  See Ex. 2, Email to Margaret C. Hershiser from Christine A. Lustgarten, dated April 25, 2010.

She stated that she and McGinn met with law enforcement at the Koley Jessen office on June 29, 2010.  At the meeting in June 2010, she gave the Omaha Police Department ("OPD") the information and documents they had collected to date.  There was no bakery-barter file, Discover Card file or NFM file among those documents.  In March 2010, she was only aware of the NFM file.  She stated the school district would not have known what records to retain because the scene was still unfolding.  She was aware that Zagozda had shredded some documents, but stated she had not directed him to do so.  She testified she never told the District not destroy any documents regarding Mr. Clark.  In September 2010, she had a follow-up meeting at the OPD headquarters.  She did not recall any contact with law enforcement between June 2010 and September 2010.

Allison McGinn also testified at the hearing.  She stated she searched for the files.  She was told to look in the credenza above the computer and that was where she looked.  She did not find any such files.  She also looked through lateral file cabinets and in file drawers, etc., and never found the files.

She testified that she met with Clark on April 23, 2010, with a letter of termination.  She did not inventory the materials in Clark's office.  Sue Evanich had been in Clark's former office and had collected some items to return to Clark, including a clock, personal effects, a pay-flex file and a cafeteria-plan file.  She also stated she did not direct anyone to secure the records in Clark's office.  Her understanding was that the office was locked.  McGinn also testified that she was aware that Clark's wife

provided many cakes and other baked goods for the office.  She knew they had monthly birthday parties.

Several law enforcement officers also testified at the hearing.  OPD Detective Sandra Wylie testified that he met with McGinn and Hershiser on June 29, 2010. Detective Wylie received some records from the District at that time.  She stated the OPD looked through the documents and attempted to include a federal agency because of the amount involved.  She stated Detective Sheridan contacted the Department of Education and she met with Federal Agent Jeffrey S. Kenny on September 20, 2010. Hershiser was also present.  They briefed him on the details, then closed the case for OPD purposes.  She testified she did not retrieve any documents from Clark's office or the District Administration Building.

Secret Service Agent Brock M. Farris testified that he told OPD Detective Wylie to pursue a fraud case with the Department of Education.  Jeffrey Kenney, Special Agent for the United States Department of Education, testified that he conducts criminal investigations on complaints of fraud against entities that receive federal funds for education.  He met with OPD officers and District counsel on September 14, 2010.  He had not spoken to district officials or counsel or conducted any independent investigation prior to that meeting.  His agency officially took over the investigation in late September or early October 2010.

He met with Hershiser and McGinn in November 2010 at the Koley Jessen law firm.  They discussed 3 folders:  the bakery file, a red receipts file, and an NFM file.  The District's attorneys told him the files could not be located.  He interviewed people about the files, confirmed that the files had once existed, but could not determine what  had

happened to them.  He obtained a search warrant and searched Clark's former office, but did not find the files.

Defendant Clark also testified at the hearing.  He stated that when he left the District, there was a large red expandable file folder in the vault.  He testified that he had put a receipt in the folder two days earlier.  He stated that the bakery-barter file was an old manila folder with yellow legal paper in it and the rest of the pages were purple.  The file contained receipts and a running tally of the total that he had spent on bakery goods.  From that total, he would deduct the amount that he owed the District for purchase of items of a personal nature that were reflected on Sam's Club Discover Card statements.

He stated that the Sam's Club Discover Card folder kept in the vault contained receipts, credit card statements and copies of the District checks he wrote for payments to the credit card.  He also stated that there was a brown, expandable 1-to-2 inch thick folder called "Clark payments" that was kept in his bottom credenza, along with all of the ECD vendor files.  Further, he stated that a petty cash folder existed and in that folder were Foundation documents, financial reports, investment reports, staff and employee contracts, checks, etc.  He testified that other Foundation files were kept in the basement.  Clark testified that all of the files he described existed on March 30, 2010.

He also testified that there were handwritten notes on the computer printouts in the binders.  He stated that he had been told of the meeting on March 30, 2010, shortly before it occurred via a phone call.  He testified he had gone shopping with an employee, Peggy Ruprecht, at NFM and Office Depot earlier that day.  Further, he testified that he and Peggy Ruprecht put documents into the red folder that day,

including Peggy Ruprecht's receipt for an iPad cover.  The previous day, he had gone to Walmart for dishtowels with Jaworski and he also put that receipt in the red folder.

He stated the red folder was four to six inches thick and contained records from 2005 forward.  The Sam's Club Discover Card statements and receipts were in the folder.  He also testified that the Sam's Club Discover Card was issued to him and he was instructed by the District to use the card.   The receipts were from numerous locations because the card could be used as a credit card anywhere.  He stated the folder also contained District checks that were also part of the electronic accounting program maintained by the District.   A copy of the check would be stapled to the invoice.   The checks were for the whole amount due on each statement.   On each statement, he would have written "I owe" next to the charge for any personal items he had purchased.  He would then deduct the amount he owed from the running total he maintained in the bakery-barter file.

Clark testified that he generally received the Discover Card statement in the mail during the third week of each month and the payment was due during the first week of the following month.  He always paid the account with District checks and would attach a copy of the check, along with receipts for purchases, to the statement before he placed it in the red folder.  He testified that he reconciled all the statements and they were organized chronologically in the file from 2005 to February 2010.  He took the red folder from the vault to his office every month.  He never took it home or to his car.  He also stated that no one else took the folder out of the vault.  He last saw the folder the day of his termination, after he came back from lunch with Peggy Ruprecht.  He would not have taken it out of the vault that day.  He testified that he shredded the Discover Card after his termination.

Clark identified the March 2010 Discover Card statement that was found on his desk the day of his termination.  *See* Exhibit 104.  His writing is on the statement.  It was reconciled with receipts from wherever the card was used.  He did not recall whether he had yet attached receipts to the statement.  He stated that if the receipts were on his desk, he would ordinarily attach them then.

He also stated that the bakery-barter file contained 20 years of entries.  He kept the bakery records in a thin file inside the cupboard above his computer.  He "purchased" baked goods for the District from a Hy-Vee bakery for an undisclosed price through his wife who worked in the Hy-Vee bakery.  He described handwritten receipts for the baked goods. These receipts for the items were loosely kept in the file.  The running total listed every item, with notations for the date, description of the item, and the retail value of the item.  He stated he last saw the bakery-barter file a few weeks before his termination.

He stated the last time he saw the NFM file was in 2008 at the time of the golf tournament.  He further testified that the NFM file contained cash receipts for his purchases to hide them from the auditors.  He testified that Dr. Inzerello told him in 1999 that auditors had raised questions about golf tournament purchases.  Inzerello decided they should purchase items for the golf tournament with their own funds for later reimbursement with NFM gift cards since the District already purchased gift cards.  Clark also stated there could be gift card entries in the bakery-barter file.

He testified he was paid by ECD for services he performed for ECD, and ECD was then reimbursed by the District.  On March 30, 2010, he went back to his office, followed by Dr. Estee and Dr. Evanich, took his keys and left.  He did not tell them at that time that he needed any files.  He further testified there were no locks whatsoever

in his office.  He stated he had 10 pay-flex folders and received only one from the District.  He did not get a vacation folder.  He did not ask to be allowed to search himself.

### II.  LAW

Consideration of this issue is framed by two United States Supreme Court cases, *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  The government violates a defendant's due process rights when it does not preserve material exculpatory evidence.  *Trombetta*, 467 U.S. at 488–89; *see also United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).  To satisfy the standard of constitutional materiality, the missing evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Trombetta*, 467 U.S. at 488-89.  The Supreme Court has suggested and circuit courts have held that no showing of bad faith is necessary if the evidence is material exculpatory evidence as defined in *Trombetta*.  *See Youngblood*, 488 U.S. at 57; *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006); *United States v. Estrada*, 453 F.3d 1208, 1212-13 (9th Cir. 2006); *Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002); *Wright*, 260 F.3d at 571 (all holding that the destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith); *but see Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004)  (in order to assert a § 1983 due process claim, a defendant must demonstrate that the police acted in "bad faith").

If the lost evidence does not meet the standard of constitutional materiality, but is "potentially useful," the failure to preserve the evidence does not constitute a denial of

due process of law "unless a criminal defendant can show bad faith on the part of the police." *Youngblood*, 488 U.S. at 58; *Fisher*, 540 U.S. at 549 (noting the applicability of the bad-faith requirement in *Youngblood* depends "on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence."); *Magraw v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014) (stating "[f]airly read, *Trombetta* and *Youngblood* frame a dichotomy between evidence that is apparently exculpatory and evidence that is no more than potentially useful."); *Olszewski v. Spencer*, 466 F.3d 47, 56-57 (1st Cir. 2006). Accordingly, (1) the destruction of "apparently exculpatory" evidence does not require a showing of bad faith but (2) if the evidence is only "potentially useful," a bad-faith showing is required. *Olszewski*, 466 F.3d at 57; *United States v. Davis*, 690 F.3d 912, 922-23 (8th Cir. 2012) (stating that the government's failure to preserve evidence does not constitute a denial of due process unless the state acted in bad faith, the evidence had apparent exculpatory value, and comparable exculpatory evidence was not reasonably available to the defendant; unless a defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute denial of due process of law), *cert. granted, judgment vacated on other grounds*, 133 S. Ct. 2852 (2013), *reinstated in relevant part*, 736 F.3d 783, 784 (8th Cir. 2013); *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) ("impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government"); *United States v. Estrada*, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (only requiring a showing of bad faith when the evidence is "potentially exculpatory, as opposed to apparently exculpatory"); *Bullock v. Carver,* 297 F.3d 1036, 1056 (10th Cir. 2002) ("A defendant can obtain relief under the Due Process Clause when he can show that a police department destroyed evidence

with 'an exculpatory value that was apparent before [it] was destroyed.' . . .   Where, however, the police only failed to preserve 'potentially useful' evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence.") (internal citations omitted).  A determination of bad faith turns on the government's knowledge of the evidence's exculpatory value at the time it was lost or destroyed.   *Youngblood*, 488 U.S. at 56 n.*; *Wright*, 260 F.3d at 571.  Negligence, even gross negligence, on the part of the government does not constitute bad faith.  *Id.*

Under the second prong of the standard of constitutional materiality under *Trombetta*—that the evidence be irreplaceable—the court considers whether the defendants "were without alternate means of demonstrating their innocence." *Trombetta*, 467 U.S. at 490; *Olszewski*, 466 F.3d at 58 (proof of irreplaceability is required in both apparent and potential exculpatory evidence cases).  "The question of whether evidence is 'to some extent irreplaceable' is a legal question based on underlying facts."  *Olszewski*, 466 F.3d at 58; *see Trombetta*, 467 U.S. at 489.

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction."  *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) (citation omitted).  Intentional destruction is defined "not as a knowing and willful removal of evidence, but as removal with the purpose of rendering it inaccessible or useless to the defendant in preparing [his] case; that is, spoiling it."  *Id.; see United States v. Spalding*, 438 Fed. App'x 464, 467 (6th Cir. 2011). *United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010).  A "spoliation" instruction, allowing an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence

favorable to one side was destroyed by the other.  4 L. Sand et al., Modern Federal Jury Instructions § 75.01 (instruction 75-7), at 75-16 to 75-18 (2010).  The burden is upon the party seeking the instruction to establish such evidence.  *Id.*, § 75.01, at 75-18; *United States v. Lopez-Lopez*, 282 F.3d 1, 18 (1st Cir. 2002) ("[A] defendant is not entitled to an instruction on a defense when the evidence in the record does not support that defense"); *United States v. Laurent*, 607 F.3d 895, 902-03 (1st Cir. 2010).

The Eighth Circuit Court of Appeals has not applied the spoliation doctrine in a criminal case, but, even if it "were to do so, a showing of the government's bad faith would be required."  *United States v. Tyerman*, 701 F.3d 552, 561 (8th Cir. 2012) (finding no error in district court's refusal to give a spoliation instruction).  The Eighth Circuit would also require a defendant to demonstrate prejudice.  *Id.*  The Eighth Circuit has explicitly rejected a negligence standard as a basis for spoliation sanctions. *Stevenson v. Union Pacific R.R.*, 354 F.3d 739, 746-47 (8th Cir. 2004); *see Tyerman*, 701 F.3d at 561.

### III.  DISCUSSION

Although the court is inclined to believe that the District's actions in investigating Clark's alleged misconduct are attributable to the State, the court need not determine that issue because the court finds that the defendant has not demonstrated a due process violation under *Trombetta* and *Youngblood*.

The evidence shows that the three files at issue existed at one time.  However, only the defendant testified that the bakery-barter file and the Discover Card statement file existed at the time of his termination.  Based on the evidence presented at the hearing, it seems likely that the NFM file was discarded at the time Dr. Evanich took over as the Assistant Superintendent and moved into Dr. Inzerello's office, long before

18

the defendant's termination.  Dr. Evanich would have had no reason to know the file had any significance at that time.

The evidence also supports the finding that the other two files were not among those shredded in September 2010 at Zagozda's direction.  The court credits Zagozda's testimony that the documents shredded were computer printouts of information maintained electronically in the District's accounting system.  The testimony of both Dr. Inzerello and the defendant indicates that "off-the-books" transactions were memorialized in the files.  That evidence would be both inculpatory and exculpatory to both the defendant and the District.  Accordingly, the court finds that the defendant has not shown that the materials are necessarily exculpatory.  Nor has he shown that any exculpatory value the files may have had would have been apparent to the District at the time of the files destruction, even if it were shown the District was responsible for discarding the files.

Although the evidence shows that the materials may have been potentially useful, the defendant has not shown any bad faith on the part of the District so as to amount to a due process violation.  The court credits the testimony that the District performed a good faith search for the documents but did not find them.  Many District employees would have had access to both the vault and Clark's former office.  The vault was open during business hours and Clark's office was not locked.  The defendant has shown only that the files are missing—not that the District is responsible for their loss. Though it would have been prudent under the circumstances for the District's legal counsel to have advised the District's employees to preserve any documents pertaining to the defendant, the court cannot find counsels' actions were taken in bad faith.

Except for the curious off-books bakery transactions, the defendant has not shown that the materials are irreplaceable or that the evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.  Presumably, NFM, Sam's Club, and Discover Card maintain records of some of the transactions and evidence also indicates that some Foundation records are maintained in the District's archives.  Even the bakery transactions could be estimated based on the number of retirements and birthdays for which baked goods would have been procured by the defendant or reconstructed by any records the defendant's wife or Hy-Vee kept.

Accordingly, the court finds the defendant has not shown he is entitled to dismissal on the ground of destruction of exculpatory evidence.  The remedy, if any, would be an adverse inference instruction if there should be a proper showing at trial. Whether any such an instruction is necessary or appropriate cannot be determined at this time.

THEREFORE, IT IS ORDERED:

1.  Defendant's objections (Filing No. 59) are sustained.

2.  The findings and recommendation of the magistrate judge (Filing No. 58) are not adopted.

3.  For the reasons stated herein, the defendant's motion to dismiss (Filing No. 40) is denied.

Dated this 22nd day of April, 2014.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge

20